IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:22-cv-02582-CNS-STV

ESTATE OF GRAHAM HEBERT, by and through personal representative Michele Bourgeois,
and MICHELE BOURGEOIS,

      Plaintiffs,

v.

REGINA MARINELLI, in her official capacity;
BOARD OF COUNTY COMMISSIONERS OF JEFFERSON COUNTY;
ROCKY MOUNTAIN CARE AND CONSULTING LLC, d/b/a RMCC Berry House and Legacy
House Elder Care;
TEDDI SAMUEL;
HILARY SAMUEL;
AARON FOSLER; and
JEFFREY PEDERSON,

      Defendants.

---

# ORDER

---

Before the Court is Defendants Board of County Commissioners of Jefferson County (the "Board"), Jefferson County Sheriff Regina Marinelli (the "Sheriff"), Jefferson County Deputy Sheriff Jeffrey Pedersen, and former Jefferson County Deputy Sheriff Aaron Fosler's (collectively, the "Jefferson County Defendants'") Motion to Dismiss First Amended Complaint Pursuant to Federal Rule of Civil Procedure Rule 12(b)(6) (ECF No. 38), and Defendants Rocky Mountain Care and Consulting, LLC, Teddi Samuel, and Hilary Samuel's (collectively, the "Rocky Mountain Care Defendants'") Motion to Dismiss Pursuant to Federal Rule of Civil Procedure

1

12(b)(6) (ECF No. 39). For the following reasons, the Court GRANTS IN PART and DENIES IN PART the Jefferson County Defendants' dismissal motion, and DENIES the Rocky Mountain Care Defendants' dismissal motion.

## I. BACKGROUND[1]

On January 1, 2021, thirty-year-old Graham Hebert entered Blue Heron Park, a park located in Jefferson County, Colorado, wearing underwear and house slippers (ECF No. 34 at 1–2, 13 ¶¶ 1, 64). Mr. Hebert had cognitive disabilities, suffering a psychiatric crisis (*see, e.g., id.* at 1–2 ¶ 1). It was below freezing (*id.* at 13 ¶ 65).

The nature of Mr. Hebert's disability was complex, involving the combined effects of a traumatic brain injury, severe neurological abnormalities, substance abuse disorders, and other mental health disorders (*id.* at 7–9 ¶ 26, 28, 35, 37). He was a resident of Berry House, a brain-injury assisted living residence (*id.* at 6, 8, 10 ¶¶ 18, 27, 40). Berry House provided assisted living and "brain injury specific supportive services" (*id.* at 10 ¶ 44). Prior to his Berry House admission, Mr. Hebert was hospitalized under an "M-1 hold," having been deemed gravely disabled and a danger to himself (*id.* at 8 ¶ 27). He had a history of cannabis use and cannabis-induced psychosis, and previously engaged in self-harm and attempted suicide (*id.* at 8 ¶¶ 29–31). He reported "thoughts of suicide," symptoms of depression, and other symptoms indicating a heightened risk of self-harm (*id.* at ¶ 32). In December 2020, Mr. Hebert began manifesting a behavioral "manic phase" and indications of hallucinations and psychosis (*id.* at 11–12 ¶¶ 52–53, 57). On December 31, 2020, Mr. Hebert was in a "crisis state" (*id.* at 13 at ¶ 62). Mr. Hebert's psychiatric provider

---

[1] The background facts are taken from the well-pleaded allegations in the Amended Complaint. *See, e.g., Porter v. Ford Motor Co.*, 917 F.3d 1246, 1247 n.1 (10th Cir. 2019).

had instructed Berry House staff that if Mr. Hebert manifested signs of mental distress and self-harm that they should seek to admit him to a crisis center or emergency room, or call for an ambulance (*id.* at 12 ¶ 54).

When Mr. Hebert walked to Blue Heron Lake on January 1, 2021, Defendant Hilary Samuel called law enforcement for assistance (*id.* at 14 ¶ 68). Defendants Fosler and Pederson, deputies of the Jefferson County Sheriff's Office, arrived at Blue Heron Lake, where they located Mr. Hebert (*id.* at 14 ¶ 69; *see also id.* at 23 ¶ 108). Confirming his disability, Defendants Fosler and Pederson told Mr. Hebert: "I know where you live and I know where you're from," remarking as well that Mr. Herbert was confused and wearing his underwear (*id.* at 14–15 ¶¶ 72–73). Mr. Hebert responded, informing Defendants Fosler and Pederson of his brain injury and disability (*id.* at 15 ¶ 74). Defendants Fosler and Pederson operated under several written Jefferson County Sheriff's Office polices and procedures (*see, e.g., id.* at 23 ¶ 108).

Defendants Fosler and Pederson returned Mr. Hebert to Berry House and left (*id.* at 15 ¶ 76). Berry House staff ultimately asked Defendants Fosler and Pederson to return (*id.* at 16 ¶ 79). Defendants Fosler and Pederson then interviewed Mr. Hebert, and it was "obvious" to them that Berry House staff were "ill-equipped" to ensure Mr. Hebert's safety as well as that Mr. Hebert was in a "psychotic state posing a clear risk to his safety" (*id.* at 17 ¶¶ 84, 87; *see also id.* at 18 ¶ 90). Defendants Fosler and Pederson knew that Mr. Hebert was experiencing hallucinations, required immediate psychiatric care, and that his behavior provided legal justification for an M-1 involuntary hospitalization (*id.* at 18–19 ¶¶ 91, 94). They did not seek to hospitalize Mr. Hebert on any basis (*id.* at 18–19 ¶¶ 92–93). When asked whether Mr. Hebert should be hospitalized, Defendant Pederson stated: "if [Mr. Hebert] was actively talking about hallucinations and things

like that with me, I would take him to the hospital (*id.* at 19 ¶ 96). Going to the hospital was not the "best idea," Defendant Pederson said to Mr. Hebert, and that "if I were in your position I would want to be in my house, chilling in my room" (*id.* at 20 ¶ 99). Defendants Fosler and Pederson filed reports regarding these events afterward (*id.* at 21 ¶ 102). Berry House staff also did not seek to call an ambulance for Mr. Hebert or admit him to a crisis center or emergency room (*see, e.g., id.* at 12–17, 31 ¶¶ 54, 63, 68, 78, 86, 135).

In crisis, Mr. Hebert left Berry House later that afternoon (*id.* at 31 ¶ 137). At approximately 2:17 p.m., he walked onto the partially frozen reservoir at Blue Heron Park, fell into the reservoir, and drowned (*id.* at 32 ¶ 144). Berry House staff filed a missing person report on January 2, 2021 (*id.* at 33 ¶ 147). Mr. Hebert's body was discovered on February 6, 2021 (*id.* at 36 ¶ 164).

Mr. Hebert's mother, in her individual capacity and as the representative of Mr. Hebert's estate (collectively "the Estate"), filed this lawsuit in October 2022 (ECF No. 1). The Estate filed its Amended Complaint in February 2023, asserting claims under 42 U.S.C. § 1983 and *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), the Colorado Constitution, and for wrongful death against Defendants (*see generally* ECF No. 34). The Jefferson County Defendants and Rocky Mountain Care Defendants filed their dismissal motions in February 2023 (ECF No. 38; ECF No. 39). The dismissal motions are fully briefed.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Allegations are read in "the context of the entire complaint" and taken as a whole. *See Chilcoat v. San Juan*

*Cnty.*, 41 F.4th 1196, 1207 (10th Cir. 2022) (quotation omitted). To survive a motion to dismiss, a complaint must allege facts, accepted as true and viewed in the light most favorable to the plaintiff, to state a claim to relief that is plausible on its face. *See, e.g., Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016). A plausible claim is one that allows the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing a claim's plausibility, courts need not accept "conclusory statements of law." *See Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). "An allegation is conclusory where it states an inference without stating underlying facts or is devoid of any factual enhancement." *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021) (citation omitted). "[G]ranting [a] motion to dismiss is a harsh remedy which must be cautiously studied," and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (second alteration in original) (quotation omitted).

### III. ANALYSIS

Having considered the Defendants' dismissal motions, related briefing, and relevant legal authority, the Court grants in part and denies in part the Jefferson County Defendants' dismissal motion, and denies the Rocky Mountain Care Defendants' dismissal motion. It considers Defendants' dismissal motions in turn, beginning with the Jefferson County Defendants' dismissal motion.

**A. Jefferson County Defendants' Motion to Dismiss**

The Jefferson County Defendants argue that the Board is not a proper party to this lawsuit, the Estate has failed to state a plausible due process claim against Deputies Pedersen and Fosler, and that the Estate has failed to state a plausible municipal liability claim (*see generally* ECF No. 38). The Court considers the Jefferson County Defendants' arguments in turn.

*1. Board of County Commissioners of Jefferson County as a Named Party*

The parties dispute whether it is proper to include the Board of County Commissioners of Jefferson County as a party to this suit (ECF No. 38 at 4; ECF No. 45 at 17 n.12). The Court recently addressed this issue *in Rogacki v. Board of County Commissioners of Jefferson County., Colorado*, No. 1:21-cv-02281-CNS-KLM, 2023 WL 34755, at *2–3 (D. Colo. Jan. 4, 2023). There, the Court concluded that dismissal of the Board of County Commissioners as a party to plaintiff's lawsuit and § 1983 claim was inappropriate at the motion to dismiss stage. *Id.* at *2. So too here. For the same reasons set forth in *Rogacki*, given the nature of the Estate's allegations regarding both the Board and the Sheriff, dismissal of the Board as a party at this time is improper (*see* ECF No. 34 at 5, 24 ¶¶ 17, 113). *See id.* at *2 ("[W]hen a plaintiff alleges that a Board of County Commissioners was itself involved in setting or implementing . . . allegedly unconstitutional policies, dismissal of the plaintiff's claims against the Board at the motion to dismiss stage is unwarranted." (citations omitted). Of course, discovery may reveal that the Board was not involved in setting or implementing any of the allegedly unconstitutional policies. If so, dismissal of the Estate's claim against the Board may be warranted at a later stage of litigation. *Rogacki*, 2023 WL 34755, at *3; *see also Chavez v. Bd. of Cnty. Comm'rs of Lake Cnty., Colo.*, 426 F. Supp. 3d 802,

814 (D. Colo. 2019) ("[B]y the time of summary judgment and/or trial, [p]laintiffs will need to explain clearly the policy at issue and the policymaker(s) to whom the policy is attributable.")

### 2. *Due Process Claim*

The Jefferson County Defendants argue that the Estate has failed to state a plausible due process claim against Defendants Fosler and Pederson (ECF No. 38 at 5).[2] According to the Jefferson County Defendants, dismissal of the Estate's claim is warranted because the Estate cannot establish Defendants Fosler and Pederson's due process liability under a theory of state-created danger (*id.* at 5–6). The Estate contends that it has adequately pleaded a due process claim under a state-created danger theory of liability (*see* ECF No. 45 at 8). The Court agrees with the Estate.

State officials' conduct may expose them to several forms of constitutional liability. *See, e.g., Anderson v. Worstell*, 492 F. App'x 913, 916 (10th Cir. 2012); *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). For instance, under the "danger-creation theory," a state official may be liable when he "affirmatively acts to create, or increase a plaintiff's vulnerability to, danger from private violence." *T.D. v. Patton*, 868 F.3d 1209, 1221 (10th Cir. 2017) (alteration and quotations omitted); *see also Armijo By & Through Chavez v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1263 (10th Cir. 1998). Accordingly, to set forth a "danger-creation claim," a plaintiff must satisfy two preconditions: that the state actor took an "affirmative action" that resulted in "private violence injuring the plaintiff." *Thomas v. White-Gordon*, 672 F. App'x

---

[2] The Estate brings its due process claim pursuant to Colorado, rather than federal, law (ECF No. 34 at 46). Nonetheless, the parties analyze the Estate's due process claim using federal law (*see, e.g.,* ECF No. 38 at 5 n.5, 6; ECF No. 45 at 9). The Court does so as well.

832, 836 (10th Cir. 2016) (citation omitted). After satisfying these preconditions, a plaintiff must demonstrate:

> (1) the state officials created the danger or increased plaintiff's vulnerability to the danger in some way;
>
> (2) plaintiff was a member of a "limited and specifically definable" group;
>
> (3) defendants' conduct put plaintiff at "substantial risk of serious, immediate, and proximate" harm;
>
> (4) the risk was obvious or known;
>
> (5) defendants acted recklessly in conscious disregard of that risk; and
>
> (6) the conduct, "when viewed in total, is conscience shocking"

*Patton*, 868 F.3d at 1222 (citation omitted). "Neither ordinary negligence nor permitting unreasonable risks" qualifies as conscience shocking. *Id.* (citation omitted). Fundamentally, the state-created danger theory imposes due process liability on state officials for acts of private violence provided that "the danger the state actor created, or rendered the victim more vulnerable to, precipitated a deprivation of life, liberty, or property in the constitutional sense." *Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 922 (10th Cir. 2012).[3]

### a. State-Created Danger Claim's Preconditions

**First**, regarding the "affirmative action" precondition, the Jefferson County Defendants contend that the Estate has failed to adequately allege that Defendants Fosler and Pederson's

---

[3] The Court notes that the Estate proceeds under a danger-creation theory based on Defendants Fosler and Pederson's conduct. For this reason, the Estate's theory of liability does not implicate cases that concern the special relationship doctrine. *See Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995); *Pena v. DePrisco*, 432 F.3d 98, 109 (2d Cir. 2005) (likewise noting that "special relationships and state created dangers as separate and distinct theories of liability" (citation omitted)).

conduct constituted "affirmative actions" sufficient to sustain a danger-creation claim (ECF No. 47 at 5; *see also* ECF No. 38 at 8). The Estate argues that it has alleged several affirmative actions undertaken by Defendants Fosler and Pederson, chief of which is the false statement that Mr. Hebert was "not hallucinating and did not need hospitalization" (ECF No. 45 at 11; *see also id.* at 9). Reading the Amended Complaint in its entirety, *see Chilcoat*, 41 F.4th at 1207, the Court agrees with the Estate.

As alleged in the Amended Complaint, Defendants Fosler and Pederson engaged in affirmative actions that satisfy the Estate's state-created danger claim's precondition. For instance, the Estate alleges that Defendants Fosler and Pederson discouraged Mr. Hebert from seeking psychiatric treatment or hospitalization—and misrepresented Mr. Hebert's condition to a Berry House employee—notwithstanding Mr. Hebert's reports that he had experienced hallucinations that day (ECF No. 45 at 8, 11; ECF No. 34 at 19 ¶ 96). Defendant Pederson's body-worn camera recordings support—and do not contradict—these allegations (Ex. A-1 9:39–9:52).[4] *Cf. In re Flint Water Cases*, 960 F.3d 303, 329 (6th Cir. 2020) ("For a document to contradict the complaint, it must 'utterly discredit' the allegations." (citation omitted)). Defendant Pederson stated explicitly that, if he was Mr. Hebert, he would prefer to be "chilling" in his room, rather than seeking hospitalization or psychiatric care—even though Defendant Pederson knew Mr. Hebert was experiencing hallucinations and was in psychiatric distress (ECF No. 34 at 20 ¶ 99; Ex. A-1 at

---

[4] The Jefferson County Defendants submitted body-worn camera recordings in connection to their dismissal motion and urge the Court to consider these recordings (*see* ECF No. 38 at 3 n.4). The Estate contends that consideration of the recordings at this stage is inappropriate (ECF No. 45 at 7). The Court disagrees. Given the nature of the Estate's allegations, the Court may consider the body-worn camera recordings in its analysis of the Jefferson County Defendants' dismissal motion. *See, e.g., Lehmann v. Zehner*, No. 1:22-cv-00204-CNS-MEH, 2022 WL 11732949, at *3 n.4 (D. Colo. Oct. 20, 2022). "Ex. A-1" refers to the first recording exhibit submitted in connection with the Jefferson County Defendants' dismissal motion.

4:32–4:42, 6:55–7:03). And Defendant Pederson stated to the Berry House staff member—despite his knowledge of Mr. Hebert's mental state and comments regarding hallucinations—that "*if* [Mr. Hebert] was actively talking about hallucinations . . . I would take him to the hospital" (Ex. A-1 at 6:20–6:25, 9:39–9:50) (emphasis added); *see also* ECF No. 34 at 19 ¶ 96. This statement is an affirmative misrepresentation of Mr. Hebert's alleged mental state that goes beyond mere negligence or inaction. *See also Patton*, 868 F.3d at 1226 (finding that "affirmative conduct" precondition was satisfied in part where individual "intentionally withheld relevant information" from final report to juvenile court and made later recommendation regarding minor's placement in unsafe home).[5]

Therefore, Defendants Fosler and Pederson's statements and conduct—contrary to the Jefferson County Defendants' argument that their conduct was merely a form of inaction—is sufficient to demonstrate affirmative actions on the part of Defendants Fosler and Pederson that created or increased Mr. Hebert's vulnerability to private violence (*see, e.g.,* ECF No. 38 at 8; ECF No. 47 at 5–6). *See B.A.L. by & through Stephenson v. Laramie Cnty. Sch. Dist. No. 1*, No. 2:16-CV-00091, 2016 WL 10570871, at *6 (D. Wyo. Nov. 30, 2016) (determining that allegations satisfied affirmative action precondition where state official was aware of inappropriate relationship between teacher and student but "decided not to investigate [those] matters further");

---

[5] Although Mr. Hebert interacted primarily with Defendant Pederson, Defendant Fosler spoke to Mr. Hebert twice during the Defendants' return to Berry House (Ex. A at 5:16–5:30, 6:02–6:12). The Court additionally notes that, notwithstanding this, Defendant Fosler was always with Deputy Pederson during the Defendants' first and second interactions with Mr. Hebert. Moreover, the Jefferson County Defendants do not argue that Defendant Fosler may escape liability based on his more limited participation in the Defendants' conversation with Mr. Hebert (*cf.* ECF No. 45 at 11 n.6).

*Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001); *cf. Thomas*, 672 F. App'x at 836 (observing that "mere negligence or inaction is not enough" to demonstrate affirmative action).[6]

      ***Second***, regarding the "private violence" precondition, the Jefferson County Defendants argue that the Amended Complaint fails to allege that Mr. Hebert's death was the result of private violence (ECF No. 38 at 12). The Estate contends that the Amended Complaint sufficiently alleges that Mr. Hebert died by suicide, and that suicide constitutes private violence for purposes of its danger-creation theory (ECF No. 45 at 9 n.5). The Court agrees with the Estate. The Amended Complaint alleges that Mr. Hebert's drowning in Blue Heron Lake, where Defendants Fosler and Pederson previously found him, was a foreseeable form of "self-harm" (ECF No. 34 at 22 ¶ 106; *see also id.* at 32 ¶ 144). Therefore, reading the Amended Complaint in its entirety and drawing all reasonable inferences in the light most favorable to the Estate, *see Chilcoat*, 41 F.4th at 1207, the Estate has adequately alleged an act of private violence. *See, e.g., Gray*, 672 F.3d at 918 n.6; *Hovey v. Jenkins*, No. 20-cv-00976-LTB-KLM, 2021 WL 5763337, at *4 (D. Colo. Nov. 15, 2021) (observing that cases "limited to suicide by the victim" satisfy precondition "to invoking the state-created danger theory" and collecting cases).

---

[6] The parties largely discuss the nature of Defendants Fosler and Pederson's affirmative actions in the context of the state-created danger theory's first element (*see* ECF No. 45 at 11; ECF No. 47 at 5). To be sure, the first *precondition* and first *element* for a plaintiff's danger-creation claim are analytically distinct. *See, e.g., Thomas*, 672 F. App'x at 836. But certain courts have found that where state officials "created or increased the danger causing harm" to a plaintiff under the theory's first element, this also satisfies the danger-creation theory's first precondition. *Kerns v. Indep. Sch. Dist. No. 31 of Ottawa Cnty.*, 44 F. Supp. 3d 1110, 1122 (N.D. Okla. 2014) (concluding that where the court "addressed the affirmative conduct requirement in its discussion of the first element" it had "adequately addressed" the "affirmative conduct" precondition). Notably, the Tenth Circuit has previously defined the first precondition and first element in nearly identical terms. *See Patton*, 868 F.3d at 1222 (defining preconditions as requirements that plaintiff must "show a state actor affirmatively acted to create or increases a plaintiff's vulnerability to danger from private violence" (quotations and alterations omitted)); *see also id.* (defining first element as "the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way"). As discussed further below, the Estate has alleged facts demonstrating that Defendants Fosler and Pederson created a danger or increased Mr. Hebert's vulnerability to it in some way. *Patton*, 868 F.3d at 1222. Because the Estate has also satisfied the danger-creation theory's first element, this bolsters the Court's conclusion that the Estate has alleged facts sufficient to satisfy the theory's affirmative action precondition.

Accordingly, for the reasons set forth above, the Estate has satisfied the two preconditions of its danger-creation claim. *See Thomas*, 672 F. App'x at 836; *Currier*, 242 F.3d at 923 ("The clear implication of [*DeShaney*] is that a state could be liable when it affirmatively acts to create, or increases a plaintiff's vulnerability to, danger from private violence."). The Court proceeds now in its analysis of the claim's six-factor test. *See id.*

### b. *State-Created Danger Claim's Six-Factor Test*

***Creating Danger or Increasing Vulnerability to Danger.*** Regarding the state-created danger theory's first element, the Jefferson County Defendants essentially argue that the Estate has failed to allege that Defendants Fosler and Pederson engaged in any affirmative action giving rise to liability (*see* ECF No. 38 at 8, 11). The Estate contends that it has alleged facts that satisfy the theory's first element because, by discouraging Mr. Hebert from seeking hospitalization and misrepresenting his condition to Berry House staff, Defendants Fosler and Pederson affirmatively acted "to increase the danger to Mr. Hebert" that resulted from his hallucinations and mental state (ECF No. 45 at 8; *see also id.* at 10–11). The Court agrees with the Estate.

For substantially the same reasons that the Estate has satisfied the state-created danger theory's first precondition, it has satisfied its first element. *See Patton*, 868 F.3d at 1222; *Kerns*, 44 F. Supp. 3d at 1122. As discussed above, Defendants Fosler and Pederson's alleged conduct demonstrates that they engaged in affirmative actions that increased Mr. Hebert's vulnerability to the danger related to and posed by his psychiatric distress and hallucinations, chiefly by discouraging his hospitalization and making affirmative misrepresentations to Berry House staff. *See Kuyper v. Bd. of Cnty. Comm'rs of Weld Cnty., Colo.*, No. 09-cv-00342-PAB-MEH, 2010 WL 1287534, at *6 (D. Colo. Mar. 30, 2010) (concluding plaintiff alleged facts showing affirmative

action on danger-creation claim where the complaint alleged not only that parties "failed to inform" regarding history of sexual misconduct, but that parties engaged in affirmative misrepresentations when they "*affirmatively* advised and assured" that an individual "had no such history" of misconduct (emphasis added)). These allegations—that are uncontradicted by the body-worn camera recordings—are sufficient to satisfy the danger-creation theory's first element. *See Briggs v. Johnson*, 274 F. App'x 730, 735–36 (10th Cir. 2008) (concluding that plaintiff alleged affirmative conduct by asserting defendants "discouraged reporting of additional incidents" and that obvious interpretation of allegation "is that [d]efendants affirmatively discouraged the reporting of abuse");[7] *Patton*, 868 F.3d at 1227 (concluding first element satisfied where defendant failed to inform a juvenile court of her "knowledge and concerns" regarding the potential abuse of a minor, "coupled with her affirmative incomplete and therefore misleading statements," that influenced the minor's placement decision); *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 430 (2d Cir. 2009) (finding that reasonable factfinder could conclude that officer defendants engaged in affirmative conduct that "enhanced" danger to plaintiff where plaintiff was made more vulnerable to danger based on "officers' dismissive and indifferent attitude" toward the plaintiff's complaints); *Currier*, 242 F.3d at 922.[8]

---

[7] The Court acknowledges that the district court in *Briggs* decided its motion to dismiss under a pleading standard overruled by *Twombly*. *See Briggs*, 274 F. App'x at 737 (McConnell, J., dissenting). Nonetheless, the substantive applicability of *Briggs*' affirmative conduct analysis is undisturbed by this procedural aspect of the case. *See id.* at 735.

[8] The Jefferson County Defendants contend the cases on which the Estate relies in arguing that Defendants Fosler and Pederson engaged in conduct that satisfies this element of the danger-creation theory are factually distinguishable (ECF No. 47 at 5–6). This is true. For example, *Okin* concerned police officers' response to escalating threats of domestic violence. *Okin*, 577 F.3d at 430. And *Currier* involved investigations of child abuse. *Currier*, 242 F.3d at 922. But these distinctions do not render the reasoning of these cases inapplicable. These cases amply support the Estate's contention that where, as here, state officials engage in conduct that increases a plaintiff's vulnerability to a danger, then that conduct—even officials' discouragements and misrepresentations—constitutes an affirmative action

***Limited & Specifically Definable Group.*** The Estate contends that Mr. Hebert was a member of a limited and specifically definable group (ECF No. 45 at 9). *See also Patton*, 868 F.3d at 1222. The Jefferson County Defendants argue that although the Estate has alleged Mr. Hebert's membership in several groups, none are "limited nor specifically definable" (ECF No. 38 at 8 n.6; *see also* ECF No. 47 at 8). The Court disagrees. The Estate has sufficiently alleged that Mr. Hebert, who had several cognitive disabilities and expressed suicidal ideations, belonged to a limited and specifically definable group (*see, e.g.,* ECF No. 34 at 8 ¶¶ 28, 31). *See also Armijo*, 159 F.3d at 1264 ("Armijo was a member of a limited and specifically definable group—special education students who have expressed threats of suicide."); *Currier*, 242 F.3d at 920.

***Substantial Risk of Serious, Immediate, and Proximate Harm.*** The Jefferson County Defendants argue that the Estate has failed to allege any facts showing that Defendants Fosler and Pederson's conduct put Mr. Hebert at a risk of serious, immediate, and proximate harm (ECF No. 38 at 8; ECF No. 47 at 8–10). *See also Patton*, 868 F.3d at 1222. The Jefferson County Defendants emphasize that, in their first encounter with Mr. Hebert, Defendants Fosler and Pederson located Mr. Hebert at Blue Heron Park and returned him to Berry House, as well as that their conduct did not "cause" Mr. Hebert's later departure (ECF No. 39 at 8). The Estate contends that Defendant Fosler and Pederson's discouragements and misrepresentations made in their second encounter with Mr. Hebert put Mr. Hebert at a substantial risk of serious, immediate, and proximate harm, thus satisfying this danger-creation theory factor (ECF No. 45 at 10, 12). The Court agrees with the Estate. Reading the Amended Complaint in its entirety, *see Chilcoat*, 41 F.4th at 1207, the

---

that satisfies the danger-creation theory's first element (ECF No. 45 at 12 n.8). *See, e.g., Patton*, 828 F.3d at 1227; *Kuyper*, 2010 WL 1287534, at *6.

Estate has shown that Defendant Fosler and Pederson's alleged conduct—which clearly involves more than their initial encounter with Mr. Hebert at Blue Heron Lake—placed Mr. Hebert at a substantial risk of serious, immediate, and proximate harm (*Compare* ECF No. 34 at 19–21 ¶¶ 95–97, 99–100, 102, *and* Ex. A-1, *with* Ex. A-2). *See also Patton*, 868 F.3d at 1229 ("[The defendant] thus contributed to putting [a minor] at risk of serious, immediate, and proximate harm by withholding relevant information and recommending [the minor] be placed with his father."). The Jefferson County Defendants' argument that their alleged conduct did not place Mr. Hebert at a risk of serious, immediate, and proximate cause simply because he died *after* he encountered them again in Berry House fails to persuade that the Estate has not satisfied this element of its danger-creation claim, given Defendants Fosler and Pederson's conduct during their second encounter with Mr. Hebert (ECF No. 38 at 8–9). *See Armijo*, 159 F.3d at 1264 (concluding defendants conduct put plaintiff at "substantial risk of serious, immediate, and proximate harm" by causing him to "become distraught" and threaten violence, and then "leaving him alone" with access to firearms).

***Obvious or Known Risk.*** The gravamen of the Jefferson County Defendants' argument regarding the "obvious or known risk" factor is that Mr. Hebert's risk of drowning was not obvious when they left Berry House (ECF No. 38 at 10–11; *see also id.* at 8). *See also Patton*, 868 F.3d at 1222. The Estate contends that, reading the Amended Complaint in its entirety, it is obvious that "harm like drowning in the lake might occur" (ECF No. 45 at 13). The Court agrees. As alleged, Mr. Hebert's clearly and severely distressed mental state presented a risk of harm, and Defendants Fosler and Pederson were aware of it (*see, e.g.,* ECF No. 34 at 17, 20 ¶¶ 84, 87, 99; Ex. A-1 at 4:32, 6:55–7:03). Accordingly, the Estate has alleged that the risk of harm that Mr. Hebert faced—

as a man with cognitive disabilities in psychiatric distress experiencing hallucinations—was obvious. *See Armijo*, 159 F.3d at 1264 (determining that "by [leaving the plaintiff alone], knowing of [the plaintiff's] vulnerability and risks of being left alone at home, [defendants] acted recklessly in conscious disregard of the risk of suicide"); *Currier*, 242 F.3d at 922.

***Acting Recklessly In Conscious Disregard of Risk.*** Having established that the Estate has adequately alleged that the risk of harm to Mr. Hebert was obvious or known, the Court next asks whether Defendants Fosler and Pederson acted recklessly in conscious disregard of that risk. *Patton*, 868 F.3d at 1222. The Jefferson County Defendants contend that the body-worn camera footage and the "totality of the circumstances" demonstrate that the Estate has not plausibly established that Defendants Fosler and Pederson proceeded in "conscious and unreasonable disregard of the consequences" of a known and harmful risk (ECF No. 38 at 10). The Court disagrees. As discussed above, the Estate has adequately alleged that Defendants Fosler and Pederson discouraged Mr. Hebert from seeking psychiatric treatment and, crucially, misrepresented the severity of his condition to a Berry House employee (ECF No. 34 at 19–20 ¶¶ 96, 99; Ex. A-1 4:32, 6:55–7:03, 9:39–9:52). Therefore, the Estate has alleged sufficient factual content to demonstrate at the motion to dismiss stage that Defendants Fosler and Pederson acted recklessly and in conscious disregard of the obvious risk that Mr. Hebert's mental state posed (ECF No. 45 at 13). *See also Patton*, 868 F.3d at 1230 (concluding that "conscious disregard of risk" element met where defendant intentionally excluded knowledge and concerns regarding risk in hearing reports); *Kuyper*, 2010 WL 1287534, at *6 (concluding that allegation that placing a child with known history of sexual misconduct in a home with young children "after informing the parents that there was no such history constitute[d] conduct in reckless disregard of a risk that was

obvious *and* known"); *Armijo*, 159 F.3d at 1264 (determining that by leaving a distraught and suicidal plaintiff alone "knowing of the vulnerability and risks of being left alone at home" constituted acting "recklessly in conscious disregard of the risk of suicide").

***Conscience Shocking.*** The Jefferson County Defendants argue that the Estate has failed to allege that Defendant Fosler and Pederson's conduct was conscience shocking (*see* ECF No. 38 at 12–13; ECF No. 47 at 10). The Estate contends that, when viewing their alleged conduct in total, it has sufficiently alleged factual content that shocks the conscience, chiefly by intentionally discouraging Mr. Hebert from seeking hospitalization or necessary psychiatric services and misrepresenting his condition (ECF No. 45 at 13). The Court concludes that the Estate has sufficiently alleged that Defendant Fosler and Pederson's conduct was conscience shocking.

Recall that, as the Jefferson County Defendants observe, neither "ordinary negligence nor permitting unreasonable risks" qualify as conscience shocking (*see* ECF No. 38 at 12–13). *See also Patton*, 868 F.3d at 1222. In determining whether conduct is conscience-shocking, courts view defendants' conduct "in total." *Id.* at 1230 (quotations omitted); *see also Currier*, 242 F.3d at 920 (setting forth consideration for courts in making conscience-shocking determinations and noting behavior is "viewed in total" (quotations omitted)). And in reviewing this conduct totally, a plaintiff must allege that a defendant acted with a "degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Kern*, 44 F. Supp. 3d at 1123 (quotations omitted); *Ruiz v. McDonnell*, 299 F.3d 1173, 1184 (10th Cir. 2002). This requirement may be met where a state official is "aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious disregard

and unreasonable disregard of the consequences." *Kuyper*, 2010 WL 1287534, at *8 (citing *Uhlrig*, 64 F.3d at 574).

Under this framework, the totality of Defendants Fosler and Pederson's conduct shocks the conscience. As discussed above, they allegedly discouraged Mr. Hebert from seeking necessary psychiatric care and hospitalization despite having actual knowledge of his distressed mental condition—as well as the dangers it posed—and misrepresented the severity of that condition to a Berry House staff member (ECF No. 45 at 13). *See Kuyper*, 2010 WL 1287534, at *8. This behavior, at the motion to dismiss stage, is sufficient to satisfy the conscience-shocking element of the Estate's danger-creation claim. *See, e.g., Briggs*, 274 F. App'x at 736 (concluding that plaintiff alleged conscience-shocking behavior where defendants discouraged individuals from reporting abuse and where "no reasoned justification or policy consideration" supported the conduct); *Armijo*, 159 F.3d at 1264 (affirming denial of summary judgment where, when viewed in total, defendants left a suicidal and vulnerable plaintiff alone with access to firearms and even further factual context could be developed "after a full trial"); *Patton*, 868 F.3d at 1230 (finding defendant's behavior "viewed in total" was conscience-shocking where she withheld information, failed to investigate evidence of danger, and was responsible for placement of plaintiff in dangerous environment); *Currier*, 242 F.3d at 920 (noting that "cumulative impression" of defendant's conduct must be considered in making a conscience-shocking determination and that defendant's failure to investigate and subsequent responsibility for endangering plaintiff "could be conscience shocking, depending . . . on further context as provided by discovery"); *Est. of B.I.C. v. Gillen*, 710 F.3d 1168, 1174 (10th Cir. 2013) (concluding that defendant's cumulative behavior was conscience-shocking where she failed to interview, failed to report dangers to law

enforcement, failed to follow up on law enforcement reports, and took "a more 'hands off' approach than she did in her other cases"). The Jefferson County Defendants' argument that Defendants Fosler and Pederson's conduct is not conscience-shocking because "crisis management was on its way" and that the Estate has failed to adequately allege that Mr. Hebert was at risk of harming himself fails to persuade, given the totality of Defendant Fosler and Pederson's alleged conduct and what the body-worn camera recordings show (ECF No. 47 at 10; *cf.* ECF No. 34 at 18, 22, 26 ¶¶ 91, 106, 118). *See also Patton*, 868 F.3d at 1230.

\* \* \*

To plead a plausible danger-creation claim, a plaintiff must satisfy two preconditions and six elements. *Thomas*, 672 F. App'x at 836; *Patton*, 868 F.3d at 1222. The Estate has done so.[9]

Of course, the Court does not know "what discovery may bring," and well-pleaded claims may proceed even if "actual proof of the alleged facts is improbable." *Schwartz for Est. of Finn v. City & Cnty. of Denver*, No. 1:21-cv-02160-CNS-SKC, 2023 WL 1879305, at *7 (D. Colo. Feb. 10, 2023) (citations and alteration omitted); *see also Kuyper*, 2010 WL 1287534, at *9 (concluding that defendants' conduct as alleged was conscience-shocking but noting that discovery "may alter the context in defendants' favor"). But that is not the Court's present concern. At the motion to dismiss stage, the Court is tasked with "assessing plausibility, not proof." *See Schwartz*, 2023 WL 1879305, at *7 (quotation omitted). And in doing so, the Estate's danger-creation claim survives the Jefferson County Defendants' dismissal motion.[10]

---

[9] Because the Court concludes that the Estate has set forth a plausible danger-creation claim under federal law standards, the Court agrees with the Estate that it has no reason to decide which standard under Colorado law would apply to the Estate's claim (ECF No. 45 at 14).

[10] The Jefferson County Defendants fleetingly suggest that the Estate has violated Federal Rule of Civil Procedure 11(b) (ECF No. 38 at 10 n.8). This groundless argument warrants no indulgence.

### 3. Municipal Liability Claim

The Jefferson County Defendants contend that, in addition to failing to allege an underlying constitutional violation, the Estate fails to establish any of the additional elements of a municipal liability claim (ECF No. 38 at 13). The Estate contends that its municipal liability claim is plausible on "several independent grounds" and, for this reason, survives the Jefferson County Defendants' dismissal motion (ECF No. 45 at 18). Before analyzing the Jefferson County Defendants' dismissal arguments and the plausibility of the Estate's claim, the Court briefly sets forth the legal framework governing municipal liability claims.[11]

### a. Legal Framework

A municipality faces liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), where an alleged municipal policy or custom causes a plaintiff's constitutional injury, and the policy or custom was "enacted or maintained with deliberate indifference" to an almost inevitable constitutional injury. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) (citation omitted); *see also id.* (setting forth "official policy or custom," "causation," and "state of mind" elements for § 1983 municipal liability claims). "It is axiomatic that—regardless of the form a policy or custom takes—a plaintiff must show the municipality's practice or custom caused the alleged constitutional injury." *Rogacki*

---

[11] Recall that the Estate brings its due process claim under Colorado, rather than federal, law. As with the Estate's danger-creation claim, the parties apply federal law in their analysis of the Estate's municipal liability claim (*see, e.g.,* ECF No. 38 at 14; ECF No. 45 at 17). Although, as the Jefferson County Defendants note, it is an unsettled question whether a state constitutional violation may always sustain a federal constitutional claim for municipal liability, given the parties' briefing and the plausibility of the Estate's danger-creation claim, the Court applies federal law to the Estate's municipal liability claim (ECF No. 38 at 13 n.11). Indeed, the Jefferson County Defendants assume "a plausibly pled *Monell* claim could proceed," and neither party provides the Court with any reason why, in ruling on the dismissal motion, this assumption should be disturbed, particularly where the Estate has plausibly alleged an underlying constitutional violation (*id.*; *see also* ECF No. 45 at 18 n.4).

*v. Jefferson Cnty.*, No. 1:21-cv-02281-CNS-KLM, 2022 WL 16551336, at *11 (D. Colo. Oct. 31, 2022) (citation omitted) (emphasis omitted).

Regarding the "official policy or custom" element, the plaintiff may show a policy or custom exists where the municipality maintains an alleged:

- Formal regulation or policy statement;

- An informal custom amounting to "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law";

- Decisions of employees with final policymaking authority;

- Ratification by final policymakers of the decisions of subordinates to whom authority was delegated subject to the policymakers' "review and approval";

- or the "failure to adequately train or supervise employees," as long as the failure results from "deliberate indifference" to the plaintiff's injuries.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (quotations and alterations omitted). The "official policy" requirement is intended to distinguish "acts of the municipality from acts of employees of the municipality," making clear that municipal liability is limited to actions "for which the municipality is actually responsible." *Cacioppo v. Town of Vail, Colo.*, 528 F. App'x 929, 932 (10th Cir. 2013) (quotations omitted).

As for the causation element, a plaintiff must allege that "a direct causal link between the policy or custom and the injury alleged." *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019) (quotation omitted); *see also Bryson*, 627 F.3d at 788 (stating that to establish municipal liability a plaintiff must allege a "direct causal link" between the municipal policy or custom and the alleged injury); *Schneider*, 717 F.3d at 770. Essentially, a municipality is not liable

for the constitutional violations of its employees "simply because such a violation has occurred; a policy or custom must have actually caused that violation*." Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009) (citation omitted).

Finally, for the requisite state of mind showing, a plaintiff must allege that the municipal action was taken with "'deliberate indifference' as to its known or obvious consequences." *Schneider*, 717 F.3d at 770 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 407 (1997)). This standard is satisfied where the plaintiff adequately alleges that a municipality has "actual or constructive notice that its action or failure to act is substantially certain" to result in a constitutional violation, and it "consciously or deliberately" disregards the risk of harm. *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (quotation omitted). While "notice" is often shown by alleging a "pattern of tortious conduct," a municipality's deliberate indifference may also be demonstrated if "a violation of federal rights is a highly predictable or plainly obvious consequence of a [the] municipality's action or inaction." *Cacioppo*, 528 F. App'x at 932 (citing *Schneider*, 717 F.3d at 771).

### b. Analysis

The Jefferson County Defendants argue that the Estate has failed to satisfy all three elements of a municipal liability claim (*see* ECF No. 38 at 13–20). The Court considers the Jefferson County Defendants' arguments, addressing in turn each theory of municipal liability pleaded by the Estate.[12]

---

[12] The Jefferson County Defendants argue that the Estate has failed to allege a formal regulation or policy statement (ECF No. 38 at 15). The Estate does not contest this in its Response, and for this reason the Court need not address the Jefferson County Defendants' argument. *See, e.g., Farley v. Dunkin*, No. CIV-21-66-R, 2021 WL 4450002, at *1 (W.D. Okla. Sept. 28, 2021) ("In response to the Motion to Dismiss Petitioner did not argue that a stay was appropriate and having failed to do so, he has waived the issue." (citation omitted)).

***Widespread Custom or Practice.*** First, the Jefferson County Defendants contend that the Estate attempts to bring a municipal liability claim by alleging that the Sheriff implemented a custom of violating Jefferson County Sheriff Office ("Sheriff Office") written policies, and that this custom itself amounts to an "official policy or custom" for purposes of establishing municipal liability (ECF No. 38 at 15). The Estate contends that it has adequately alleged a "standard practice" that amounted to an "unwritten but accepted policy" of violating Sheriff Office official policies regarding citizen safety sufficient to sustain a municipal liability claim (ECF No. 45 at 18). The Court agrees with the Estate.

An informal custom amounting to a "well settled" and "widespread practice," although "not authorized by law or express municipal policy," may satisfy a municipal liability claim's "official policy or custom" requirement. *Bryson*, 627 F.3d at 788 (quotations omitted). The Estate has alleged the existence of such custom. First, the Amended Complaint identifies a specific, official policy—"JCSO official Policy and Procedure 214"—under which deputies, including Defendants Fosler and Pederson, agree to assume the "duty to safeguard lives . . . be constantly mindful of the welfare of others, [and] to be honest in thought and deed in the performance of their duties" (ECF No. 34 at 23 ¶ 108). Other official policies and procedures required deputies, including Defendants Fosler and Pederson, to enforce the laws of Colorado, "including laws on the involuntary hospitalization of gravely disabled individuals" and laws regarding the referral of individuals in need of services (*id.* at 23–24 ¶¶ 110–12).

Second, the Estate has adequately alleged that a widespread and well settled custom of violating these official policies existed (*see* ECF No. 34 at 24, 26, 28–29, ¶¶ 114, 118–19, 127–29). For example, an "unwritten but official and accepted" policy of regarding M-1 involuntary

hospitalizations as a "waste of time" existed, under which deputies did not expend law enforcement resources to pursue M-1 involuntary hospitalizations because the "paperwork and process" of pursing was "time-consuming" (*id.* at 28–29 ¶ 127). Similarly, the Estate alleges that an unwritten but accepted policy existed of "ignoring" individuals in crisis to "extricate the officer from the situation so that they [did] not have to deal with the mental health crisis and therefore save law enforcement resources" (*id.* at 29 ¶ 129). Therefore, the Estate has satisfied the first requirement of its municipal liability claim based on the Jefferson County Defendants' alleged "practice . . . of violating the [Sheriff Office's] written policies" (*see id.*; ECF No. 45 at 18). *See also Bryson*, 627 F.3d at 788; *Bass v. Pottawatomie Cnty. Pub. Safety Ctr.*, 425 F. App'x 713, 716, 720 (10th Cir. 2011). And contrary to the Jefferson County Defendants' assertion, reading the Amended Complaint in its entirety, *see Chilcoat*, 41 F.4th at 1207, the Estate has alleged that other Sheriff Office deputies, not merely Defendants Fosler and Pederson, operated under a custom and procedure—in contravention of official Sheriff Office policies—to avoid hospitalizing individuals in crisis such as Mr. Hebert (*see, e.g.,* ECF No. 34 at 18–19, 28–29 ¶¶ 91, 94, 127–29). *Cf. Sexton v. City of Colorado Springs*, 530 F. Supp. 3d 1044, 1071 (D. Colo. 2021).[13]

*Second and third*, the Jefferson County Defendants argue that the Estate cannot establish the requisite causal link or state of mind (ECF No. 38 at 20). The Estate contends that the Amended Complaint has plausibly alleged that the custom of violating the Sheriff Office's official policies was the "moving force" behind the underlying constitutional violation, and that it has sufficiently

---

[13] The Jefferson County Defendants' citation to *Waller*, 932 F.3d at 1290, provides minimal support for its argument. In *Waller*, the Tenth Circuit rejected a "widespread practice" claim based on an *assumption* that a deputy "perceived that [his] conduct would be accepted by city officials," and found the plaintiff's allegations lacking in establishing a "custom of practice . . ." *Id.* Contrast the Estate's well-pleaded allegations regarding specific, official Sheriff Office policies that deputy sheriffs violated (*see, e.g.,* ECF No. 34 at 23–24 ¶¶ 110–12).

pleaded deliberate indifference (ECF No. 45 at 18). The Court agrees. Based on the alleged custom and practice of violating written policies regarding deputies' duties and the hospitalization of distressed individuals that were the "moving force" behind Mr. Hebert's injury, Mr. Hebert failed to receive necessary services to ensure his safety, and Defendants Fosler and Pederson failed to transport him to the hospital or psychiatric care facility consistent with the allegedly unconstitutional custom—despite his obvious, severe, and known mental distress (*see* ECF No. 34 at 19–20, 28–29 ¶¶ 96–99, 127–28). *See also Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1050–51 (10th Cir. 2022); *Burke v. Regalado*, 935 F.3d 960, 999–1000 (10th Cir. 2019); *Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1285 (10th Cir. 2007) ("[A] municipality is responsible for *both* actions taken by subordinate employees in conformance with preexisting official policies or customs *and* actions taken by final policymakers, whose conduct can be no less described as the 'official policy' of a municipality." (original emphasis)). Further, these allegations are sufficient to satisfy the deliberate indifference requirement of the Estate's municipal liability claim, given that this custom amounted to a deliberate disregard of the harms that it posed to suicidal or mentally disabled individuals such as Mr. Hebert, and these harms presented an "obvious potential" for constitutional violations (*see, e.g.,* ECF No. 34 at 24 ¶ 114). *See also Barney*, 143 F.3d at 1308 (citation omitted).

Accordingly—although it is a close call—the Estate has alleged enough factual content to allege a municipal liability claim based on the alleged "widespread custom" of violating written Sheriff Office policies.

***Ratification.*** The Jefferson County Defendants contend that the Estate cannot sustain a municipal liability claim based on a ratification theory (ECF No. 38 at 17). The Estate argues that

its post-incident ratification theory is viable (ECF No. 45 at 20). The Court disagrees. The Estate's Response makes clear that its ratification theory is based on "*post-incident* ratification" and "the Sheriff's decision not to discipline" Defendants Fosler and Pederson for their conduct (*id.* (emphasis added)). Because post-ratification theories of municipal liability are inviable, the Court agrees with the Jefferson County Defendants that dismissal of the municipal liability claim based the ratification theory of liability is appropriate (*see* ECF No. 38 at 18). *See also Schwartz*, 2023 WL 1879305, at *3 (collecting cases and explaining why post-ratification theories of municipal liability are not viable).

**Failure to Train.** the Jefferson County Defendants contend that to the extent the Estate's municipal liability claim is premised on an alleged failure to train or supervise, it must be dismissed, because the Amended Complaint "offers no basis" on which the Court may conclude that the Sheriff should have known her training was deficient (ECF No. 38 at 19). The Jefferson County Defendants' fundamental argument is that the Amended Complaint alleges "no other specific incidents related to deputy interactions with individuals experiencing mental health crises" occurred that would have put the Sheriff on notice of any alleged deficiencies in her training programs (*id.* at 19–20). The Estate identifies several forms of the Jefferson County Defendants' allegedly failed trainings and contends that its allegations regarding these trainings sustain a plausible municipal liability claim (*see* ECF No. 45 at 19–20). The Court agrees with the Estate.

The Court had recent occasion to address a similar failure-to-train claim in *Schwartz*, and incorporates the legal framework governing municipal liability claims based on an alleged failure to train set forth in *Schwartz* into its Order. *See* 2023 WL 1879305, at *4. The gist of the Estate's failure to train allegations and arguments mirror those in *Schwartz*: that the Sheriff failed to provide

necessary or adequate training—for instance, crisis intervention training—that resulted in deputies' inability to adequately respond to individuals experiencing mental health crises (*see* ECF No. 45 at 19–20). To be sure, the Amended Complaint's allegations center largely around Defendant Fosler and Pederson's interactions with Mr. Hebert. But, as in *Schwartz*, the Amended Complaint identifies specific training deficiencies that are closely related to Mr. Hebert's constitutional violation, and sufficiently alleges that the inadequacy of the Sherriff's training "was obvious and likely to result" in Mr. Hebert's constitutional injury, "as well as that the predictability of [Mr. Hebert's] injury could have been prevented by providing" additional and adequate training. *See Shwartz*, 2023 WL 1879305, at *5 (citations omitted). Fundamentally, as in *Schwartz*, the Estate has alleged enough factual content for the Court to answer whether Mr. Hebert's death "would have been avoided had [Defendants Fosler and Pederson] been trained under a program that was not deficient in the identified respect[s]" affirmatively. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989); *Schwartz*, 2023 WL 1879305, at *4. For these reasons, the Court rejects the Jefferson County Defendants' argument that the Estate has failed to plausibly satisfy the elements of its municipal liability claim based on an alleged failure to train (ECF No. 38 at 19–20). *Cf. Schwartz*, 2023 WL 1879305, at *5–7.

* * *

"Whether [the Estate] will have a difficult time establishing the merits of its claim is of little import now." *Woods v. City of Greensboro*, 855 F.3d 639, 652 (4th Cir. 2017). As noted above, in ruling on the Jefferson County Defendants' dismissal motion, the Court is tasked solely with determining whether, under the controlling legal standard, the Estate has alleged sufficient

factual content to set forth viable theories of municipal liability. *See Mayfield*, 826 F.3d at 1255; *Dias*, 567 F.3d at 1178. Regarding its "custom or practice" and failure to train theories, it has.[14]

## B. Rocky Mountain Care Defendants' Motion to Dismiss

The Rocky Mountain Care Defendants' dismissal argument is straightforward: "they did not have a legal duty to act in the manner alleged" in the Amended Complaint, and therefore dismissal of the Estate's negligence-based wrongful death claim is proper (ECF No. 39 at 2; *see also* ECF No. 46 at 6 n.4). The Rocky Mountain Care Defendants do not dispute that they owed Mr. Hebert a duty—rather, they dispute "the scope of the duty under the circumstances" of January 1, 2021, the day that Mr. Hebert allegedly drowned in Blue Heron Lake (ECF No. 48 at 2). According to the Rocky Mountain Care Defendants, the duty that they owed Mr. Hebert extended only to seeking "immediate emergency assistance," and that they discharged this duty (*id.*). The Court disagrees with the Rocky Mountain Care Defendants regarding the scope of the duty that they owed Mr. Hebert.

The elements of a negligence claim under Colorado law are "a legal duty, a breach of the duty, causation, and damages." *Eng. v. Griffith*, 99 P.3d 90, 93 (Colo. App. 2004) (citation omitted). A negligence claim "fails when it is based on circumstances for which the law does not impose a duty." *Id.* (citation omitted). Whether a duty "is owed by a particular defendant to a particular plaintiff" and the scope of that duty are legal questions. *Id.* (citation omitted). A defendant's duty "may arise based on . . . some pertinent statutory scheme." *Rocky Mountain Festivals, Inc. v. Parsons Corp.*, 242 P.3d 1067, 1074 (Colo. 2010), *as modified* (Dec. 13, 2010)

---

[14] As explained in *Schwartz*, to the extent the Estate's theory of municipal liability is based on *post*-incident ratification, the claim is dismissed with prejudice. 2023 WL 1879305, at *7 n.10.

(citation omitted); *see also Scott Wetzel Servs., Inc. v. Johnson*, 821 P.2d 804, 812 n.10 (Colo. 1991).

The Rocky Mountain Care Defendants identify the statute under which they state they owed a duty to Mr. Hebert (ECF No. 48 at 4; *see also* ECF No. 39 at 6).[15] Under the relevant statute, the Rocky Mountain Care Defendants owed a duty of "protective oversight" to Berry House residents (ECF No. 48 at 4). "Protective oversight" is statutorily defined as:

> (10) [G]uidance of a resident as required by the needs of the resident or as reasonably requested by the resident, including the following:
>
> (a) Being aware of a resident's general whereabouts, although the resident may travel independently in the community; and
>
> (b) Monitoring the activities of the resident while on the premises to ensure the resident's health, safety, and well-being, including monitoring the resident's needs and ensuring that the resident receives the services and care necessary to protect the resident's health, safety, and well-being.

C.R.S. § 25–27–102(10)(a)–(b).

Contrary to their argument, under this statute the Rocky Mountain Defendants had a duty to do more than simply call for law enforcement's emergency services on January 1, 2021 (*see* ECF No. 39 at 4, 9; ECF No. 48 at 5).[16] The relevant statutory language is clear: the "protective

---

[15] The Rocky Mountain Care Defendants also state that Berry House is, under Colorado law, an "Assisted Living Residence," and identify the statute defining "assisted living residence" (ECF No. 39 at 6). *See also* C.R.S. § 25–27–102(1.3).

[16] The Rocky Mountain Care Defendants argue that they did not owe a duty under Colorado's "Emergency mental health hold" statute, given that they are not "intervening professionals" under that statute (ECF No. 39 at 7). *See also* C.R.S. § 27–65–106(a)(1). The Estate does not appear to dispute the Rocky Mountain Care Defendants' position, arguing throughout its Response that the Rocky Mountain Care Defendants ran an Assisted Living Residence that was required to provide "supervision, *protective oversight*, and myriad other services" (ECF No. 46 at 14 (emphasis added)). Accordingly, the Estate provides no arguments that challenge the Rocky Mountain Care Defendants' contention that they owed no duty to seek Mr. Hebert's involuntary hospitalization under § 27–65–106, and for this reason the Court declines to impose a duty under this statute on the Rocky Mountain Care Defendants (ECF No. 39 at 7).

oversight" duty that the Rocky Mountain Defendants state applies to them contemplates a duty to ensure that residents such as Mr. Hebert receive "the services and care *necessary to protect* the resident's *health, safety, and well-being.*" § 25–27–102(10)(b) (emphasis added). As the Estate contends in arguing that the Rocky Mountain Care Defendants owed Mr. Hebert a duty, that duty encompassed protecting Mr. Hebert from the dangers of "self-harm and crisis states" through supervision, providing "access to emergency care [and] outside psychiatric care as needed" and "to otherwise ensure protective oversight of him" (ECF No. 46 at 10, 13–14). And as alleged in the Amended Complaint, Mr. Hebert's psychiatric provider informed the Rocky Mountain Care Defendants, that if Mr. Hebert was showing signs of mental distress, that they should "seek to admit [him] to a crisis center or emergency room . . . or call for an ambulance if he was a risk at self-harm" (ECF No. 34 at 12 ¶ 54). The Amended Complaint contains numerous allegations that the Rocky Mountain Care Defendants failed to call an ambulance—or Mr. Hebert's psychiatric provider or any other individual to address Mr. Hebert's crisis—despite the obvious signs of his mental distress (*see, e.g., id.* at 12–17, 31 ¶¶ 54, 63, 68, 78, 86, 135).

Thus, under the "protective oversight" statute, the scope of the Rocky Mountain Care Defendants' duty included more than simply a duty to call 911 twice, monitor Mr. Hebert's "general whereabouts," or simply "monitor" him on the premises—especially considering the nature of the Estate's allegations (ECF No. 48 at 5).[17] The fact that Mr. Hebert was able to leave the Berry House grounds does not change this conclusion, given the statute's plain language and nature of the Amended Complaint's allegations that Mr. Hebert began displaying signs of obvious

---

[17] The Rocky Mountain Care Defendants provide an instructive distillation of this argument in their dismissal motion, stating that they met their "affirmative duty to call for help . . . by twice calling for the assistance of law enforcement" (ECF No. 39 at 9).

psychiatric distress while at Berry House and before departing for the second time on January 1, 2021 (ECF No. 39 at 9; *see also* ECF No. 34 at 17 15–16 ¶¶ 77–81). Further, the Rocky Mountain Care Defendants' repeated invitations to draw inferences in their favor—for instance, that had they contacted Mr. Hebert's psychiatric provider on January 1, 2021, that "it follows . . . they would have been told to call 911"—are both unavailing and inappropriate at the dismissal stage (ECF No. 39 at 10). The Court must draw all reasonable inferences in the Estate's favor—a legal standard the Rocky Mountain Care Defendants cite and then briskly disregard in advancing several arguments (*see, e.g.,* ECF No. 39 at 4, 10; ECF No. 48 at 5). *See also Mayfield*, 826 F.3d at 1255.

Accordingly, and for the reasons set forth above, the Rocky Mountain Care Defendants owed a duty to Mr. Hebert, and the scope of that duty under C.R.S. § 25–27–102(10) encompassed providing protective oversight in the form of ensuring Mr. Hebert received services and care necessary to protect his health, safety, and well-being, in light of the statements of his psychiatric provider and the Rocky Mountain Care Defendant's alleged awareness of his distressed mental state and signs of self-harm.[18]

## IV. CONCLUSION

Consistent with the above analysis, the Court GRANTS IN PART and DENIES IN PART the Jefferson County Defendants' Motion to Dismiss First Amended Complaint Pursuant to Federal Rule of Civil Procedure Rule 12(b)(6) (ECF No. 38), and DENIES the Rocky Mountain

---

[18] The parties' briefing focuses on the duty that the Rocky Mountain Care Defendants owed Mr. Hebert and the scope of that duty (*see* ECF No. 46 at 6 n.4). Accordingly, the Court makes no determinations regarding the remaining elements of the Estate's underlying negligence claim. *See Griffith*, 99 P.3d at 93. The Court does note, however, given the Rocky Mountain Care Defendants' statement that their duty springs from a statutory authority, this could implicate the doctrine of negligence per se. *See Lombard v. Colorado Outdoor Educ. Ctr., Inc.*, 266 P.3d 412, 417 (Colo. App. 2011). Absent further, or any, briefing from the parties on the issue at this time, the Court expresses no opinion on this potential issue.

Care Defendants' Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF No. 39).

DATED this day of July 25, 2023.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge